J-S30031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.A.H. III, A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.H., JR., FATHER | : : : : : : : | |
| | : | No. 492 MDA 2024 |

Appeal from the Decree Entered March 4, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0214a

BEFORE:   PANELLA, P.J.E., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED: OCTOBER 29, 2024**

C.H., Jr. ("Father"), appeals from the March 4, 2024, decree involuntarily terminating his parental rights to his natural son, C.A.H., III, born in July of 2016 ("Child").[1]  Upon review, we affirm.

The certified record reveals that Father has a history of mental health issues, as well as drug and alcohol issues, which resulted in the juvenile court initially adjudicating Child dependent in August of 2021.  Child remained in Father's legal and physical custody, and the court discharged his dependency on November 3, 2021.  **See** N.T., 3/4/24, at 37.

---

[*] Former Justice specially assigned to the Superior Court.

[1] The record reveals that Child's mother, S.H. ("Mother"), abandoned him early in life.  **See** N.T., 3/4/24, at 48-49.  The orphans' court separately involuntarily terminated Mother's parental rights by decree on March 4, 2024, and she did not file a notice of appeal.

However, in October of 2022, York County Office of Children, Youth & Families ("CYF") received a report again alleging concerns of Father's poor mental health and drug and alcohol abuse, as well as homelessness. The court placed Child in the emergency protective custody of CYF that same month. Following a hearing on October 28, 2022, Child was placed in shelter care and then adjudicated dependent on November 21, 2022. Child's permanency goal was reunification with Father.

Child has had two foster care placements since being removed from Father's physical custody. He was transferred to his second placement in May of 2023, which is with his paternal grandmother who desires to adopt him. *See* N.T., 3/4/24, at 52, 63.

Child has multiple special needs, many of which result from the trauma he has experienced in his young life, including, but not limited to, homelessness, abandonment by Mother, a home where weapons were brandished, and a home where drugs and alcohol were abused. *See* N.T., 2/26/24, at 72-73; CYF Exhibit 1 (Psychological Evaluation, 12/8/22). Child is diagnosed with complex post-traumatic stress disorder; attention deficit hyperactivity disorder ("ADHD"); autism spectrum disorder; and prenatal exposure to alcohol, tobacco, and drugs. *See* CYF Exhibit 7 (Neuropsychological report, 5/12/23, at 29). In addition, he is diagnosed with*, inter alia,* "being affected by parental relationship distress;" suspected sexual abuse; and "academic or educational problems." *Id.* According to

Hilary Slaymaker, the CYF caseworker, Child receives "occupational therapy at school" as well as "intensive behavioral health services." N.T., 3/4/24, at 62. He was in first grade and subject to an individual education plan ("IEP") at the time of the termination hearing. *Id.* at 61.

In furtherance of Child's permanency plan, Father was primarily required to maintain his mental health and sobriety, provide a safe and secure home environment, and obtain financial stability. *See* N.T., 3/4/24, at 40. CYF referred Father to JusticeWorks, an agency that provided random drug testing services to Father. In addition, CYF referred Father to Pressley Ridge, an agency that provided (1) Father with resources for employment and housing; (2) Father and Child with individual therapy; and (3) Father and Child with therapeutic supervised visitation. Originally, CYF referred Father and Child for therapeutic supervised visitation at PA Child Support Services, which provided these services from December of 2022 until September of 2023. *Id.* at 7.

The record reveals Father was incarcerated from January 5, 2023, until March 8, 2023, for crimes involving driving under the influence, simple assault, and disorderly conduct, which as best we can discern, he committed in December of 2022. *See* N.T., 2/26/24, at 11. On November 13, 2023, Father was sentenced for his criminal convictions, which included a probationary term, the duration of which is not specified in the record. Father's probation was in effect at the time of the termination hearing, and it

required him to participate in drug testing and to obtain both mental health and drug and alcohol treatment with another agency identified by the name of T.W. Ponessa. *Id.*

On November 29, 2023, CYF filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The evidentiary hearing occurred on February 26 and March 4, 2024, during which the legal and best interests of seven-year-old Child were represented by separate counsel.

CYF presented testimony from its caseworker, Hilary Slaymaker; Father's probation officer, Zayra Belen-Mendez; JusticeWorks' case aide, Robert Pace; Pressley Ridge employees, Christina Rodriguez and Susan Hedrick; and PA Child Support Services program director, Susan Scott. In addition, Father testified on his own behalf.

At the conclusion of the testimonial evidence, the court ruled on the record in open court in favor of the involuntary termination petition. *See* N.T., 3/4/24, at 104-05. The court reasoned, "There certainly seems to be some progress by Father in the last several months, but that is . . . under the category of too little, too late." *Id.* at 105.

By decree dated and entered on March 4, 2024, the court granted CYF's petition to involuntarily terminate Father's parental rights. Father timely filed a notice of appeal, as well as a concise statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on December 2, 2024.

On appeal, Father questions whether the orphans' court erred as a matter of law and/or abused its discretion in terminating his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2] **See** Father's Brief at 4-5.

We review Father's issues according to the following standard.

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

---

[2] Child's legal counsel joined CYF's appellee brief. Child's guardian *ad litem* ("GAL") filed a letter in lieu of a brief articulating her support for the decree involuntarily terminating Father's parental rights on the basis set forth in the appellee brief and in the court's Pa.R.A.P. 1925(a) opinion.

*In re Adoption of C.M.*, 667 Pa. 268, 255 A.3d 343, 358-59 (2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis. *See id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-262 (Pa.Super. 2019).

If the orphans' court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, then the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation marks and citations omitted).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted).

In this case, we review the decree pursuant to Section 2511(a)(8) and (b), which provide as follows.[3]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

Pursuant to Section 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist;

---

[3] Based on this disposition, we need not consider Father's issues with respect to Sections 2511(a)(1), (2), and (5). **See K.M.G.**, 219 A.3d at 672.

and (3) termination of parental rights would best serve the needs and welfare

of the child. This Court has explained:

> Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. **In re M.A.B.**, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

> Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." **In re C.L.G.**, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006).

>> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, *to wit* [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

**In re M.E.**, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted).

Section 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b). Our Supreme Court in *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the Court later articulated that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, ___ Pa. ___, 296 A.3d 1085 (2023).

> Our Supreme Court has explained:
>
> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*K.T.*, 296 A.3d at 1109-1110 (some citations omitted).

As such, the *K.T.* Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. *Id.* at 1111. Moreover, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on

evidence of an 'adverse' or 'detrimental' impact to the child." **Id.** at 1114. As such, the Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." **Id.**

We long ago recognized:

Concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . .Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Furthermore, the **K.T.** Court reaffirmed that caselaw "indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **K.T.**, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the

child" in its analysis under Section 2511(b). ***See In re M.M.***, 106 A.3d 114, 118 (Pa.Super. 2014).

Instantly, with respect to Section 2511(a)(8), Father argues the evidence was insufficient to terminate his parental rights under the second and third prongs of this subsection, *i.e.*, whether the conditions which led to the removal or placement of the child continue to exist, and termination of parental rights would best serve the needs and welfare of the child.

Concerning the second prong, Father baldly asserts that "reunification could be very imminent," *i.e.*, within three months. Father's Brief at 20. Further, he asserts he successfully completed a drug and alcohol rehabilitation program, and he began seeking housing and employment prior to the filing of the termination petition. ***Id.*** at 20-21. In addition, Father asserts he did not test positive for any illegal substances since "August 2023, or approximately six months prior to termination." ***Id.*** at 21 (cleaned up). Father also claims that CYF "did not make reasonably good faith efforts" to reunify him with Child. ***Id.*** at 22. For the reasons that follow, Father's claims are either not supported by the record or they are misplaced.

With respect to the third prong of Section 2511(a)(8), Father argues the testimonial evidence presented by CYF demonstrates that a strong bond exists between him and Child and severing it "could be detrimental" for Child. ***Id.*** at 22. Father concludes CYF failed to meet its evidentiary burden under Section 2511(a)(8). We disagree.

Father's final argument relates to Section 2511(b) and is the same as his claim under Section 2511(a)(8). Father adds that testimony from the "Pressley Ridge team" demonstrates his bond with Child is "a strong and healthy parental bond, and to sever the parental bond would be a detriment" to Child. Father's Brief at 24-25. We discern no abuse of discretion by the court.

We begin with the second prong of Section 2511(a)(8). By way of context, the certified adoption docket indicates that CYF filed the termination petition on November 29, 2023, which was entered on December 4, 2023. According to CYF caseworker, Ms. Slaymaker, Father participated in the following two separate inpatient drug and alcohol rehabilitation treatment centers during Child's most recent dependency and prior to the filing of the petition: at Roxbury treatment center from the date of his release from prison on March 8, 2023, until April 6, 2023; and subsequently at White Deer Run from September 30, 2023, until October 6, 2023. *See* N.T., 3/4/23, at 42. Father was successfully discharged from both programs, but he then relapsed. This is demonstrated by his relapse in September of 2023, discussed *infra*, necessitating his admission into White Deer Run, and then by random drug and alcohol testing administered in December of 2023, and in January of 2024, both of which revealed alcohol in Father's system. *Id.* at 8-12, 65.

Upon his release from White Deer Run, Father was homeless until December 27, 2023, when he moved into a rental home. *Id.* at 44. Ms.

Hedrick, the Pressley Ridge family therapist, testified she last saw Father's home on February 7, 2024, approximately one month before the last day of the termination hearing; she observed that construction work was being done in the home; and she saw "there were no beds available." N.T., 2/26/24, at 45. Ms. Rodriguez, the Pressley Ridge resource specialist, confirmed in her testimony that Father's home is "not ready" for Child. *Id.* at 33.

With respect to his ability to pay rent, Ms. Hedrick testified Father has not provided any documentation demonstrating that he is employed, and, although he applied for Social Security disability benefits, he had not yet been approved. *Id.* at 46-47. Father testified, "Disability is not something [for which] I'm waiting around. I want to get my son back, and I need to do this to become a better person and better father. If I need to work two jobs, I will." N.T., 3/4/24, at 87. Nonetheless, Father remained unemployed at the time of the hearing. *Id.* at 86-87.

With respect to Father's therapeutic supervised visitation with Child prior to the filing of the petition, he participated weekly for one hour. *See* N.T., 2/26/24, at 49. Father did not progress to having unsupervised or even partially supervised visits by the time that notice of the petition was provided or by the time of the hearing. Ms. Hedrick explained this is because of "the decline that we've seen [in Father] that the other providers had discussed in [his] mental health and substance use." *Id.* at 50.

Specifically, Ms. Scott, from PA Child Support, who initiated therapeutic supervised visitation in December of 2022, testified she closed services for Father on September 22, 2023, because of concerns regarding his "drug and alcohol and mental health stability." N.T., 3/4/24, at 8. She testified her agency worked to help Father "maintain his stability within the visits and emotional regulation," due to Father becoming inconsistent with both his individual therapy and visits with Child starting at the end of May of 2023. *Id.* at 14. Ms. Scott stated that, during the summer of 2023, Father "gradually continued to decline." *Id.* She explained that he refused to participate in drug testing. *Id.* at 15.

Ms. Scott described one of Father's last therapeutic supervised visits overseen by her agency in September of 2023 as follows:

> He was seen nodding off and seemed to be actively under the influence and there were concerns with the need to end the visit. And Father's parenting was a concern. It seemed more militaristic in style in terms of the way Father would speak to Child and the expectations that Father would have of Child.
>
> There were some significant concerns that there wasn't quality in the visit in terms of the nurturing of a parent to a child, that Child was more so put in the position to be emotionally supportive of Father, that Father was looking for that emotional connection and support from Child[;] that Child . . . didn't know what to do [during] the visits, that he was looking to Father of what are we going to do, and because of Father's state he sort of sat there.
>
> And there was again concern of [Father] nodding off. Child didn't know whether he could play or goof off, and Father ended up yelling at Child several times when Child would attempt to play[, and Father] plac[ed] Child in timeout[,] and Father's parenting seemed unreasonable.

- 14 -

*Id.* at 16 (cleaned up).

Ms. Scott summarized that Father "struggled to put aside what he was going through in the moment and focus on [C]hild at the visits, and [F]ather's difficulty seemed to impact the quality of the visits. . . ." *Id.* at 17. For example, Ms. Scott testified Father told Child that he "didn't know where he was [going to] sleep," and so Child became "very concerned for Father." *Id.* at 18-19.

Pressley Ridge assumed therapeutic supervised visitation for Father on September 25, 2023. *See* N.T., 2/26/24, at 45. From then until December 23, 2023, Father had a total of five Zoom visits with Child, and seven in-person visits after that. *Id.* Ms. Hedrick testified Father made a "turnaround" in January of 2024, insofar as he was "not blaming anybody, he is focused on what he needs to do and . . . the things that are best for [Child]." *Id.* at 48-49. She explained:

> [F]ather has finally received the help for himself in regard to consistence with therapy beginning – obviously he did not begin the Recovery Dharma until February [of 2024],[4] but I do feel like he started understanding that his need for stability for himself was paramount. . . .

_____

[4] Father described "Recovery Dharma" as an addiction program different from NA and AA, which he alleged "in my opinion [are] outdated. . . ." N.T., 3/4/24, at 90. Father explained with respect to the program, "I studied under Buddhism for many years, and it's a lot of discipline principles that helps you keep structure in your life and helps you keep anxiety down and being able to focus." *Id.*

- 15 -

[I]f this was six months ago that it would've happened, we would be a different place, but, unfortunately, the timing is just not the best.

*Id.* at 62-63 (footnote added).

Ms. Hedrick testified with respect to Father's participation in "Recovery Dharma" as follows:

So that obviously did start here in February[.]

That has been an ongoing . . . battle between [F]ather and I where we have had many discussions since November of him attending those. He was very adamant to not do AA, NA, but he wanted to do the Recovery Dharma.

But it was made very well known that he needed to do in[-]person because to be in a group, to be with other people[,] is really where a lot of the progress can happen. So, it is great that he has started that, but that's . . . been kind of a three-month battle to get to that point.

*Id.* at 64. Ms. Hedrick testified that it would be approximately a three-month timeframe for Father to progress to partially supervised visitation with Child "if the rate [of] progress . . . would continue . . . with no safety concerns." *Id.* at 69-70.

Although Father had a "turnaround" in January of 2024, Ms. Hedrick testified she has remaining concerns for Father. She explained:

I think it's the consistency, making sure that he continues to consistently do his Recovery Dharma, actually providing proof . . . a written out documentation of meetings and sessions that he's at[tended]. . . .

[Consistency i]n regard to stability with his own mental health counseling, his medications, continuing with that, and then the biggest part is employment, not just for money purposes[,] but I

- 16 -

think for his own mental health and his sobriety, I think it's extremely important.

*Id.* at 70-71.

Similarly, Ms. Slaymaker testified:

In the last 15 months, we have not seen any major stability [with Father] when it comes to housing, finances, mental health or sobriety. . . .We would want to be able to see that he has been able to demonstrate the financial stability . . . to maintain housing, maintain the consistency in his visitation with his son . . . [, and] progress in moving forward with less and less supervision of his visitation with his son.

N.T., 3/4/24, at 68, 84-85.

The above testimonial evidence demonstrates Father did not begin to make progress in remedying the conditions which led to Child's placement until after notice of the filing of the termination petition on December 4, 2023. Thus, the court was prohibited from considering it under the Section 2511(a)(8) analysis. **See In re M.E.**, 283 A.3d at 832; **see also** 23 Pa.C.S.A. § 2511(b). In this case, the court acknowledged Father has made "some progress . . . in the last several months," but the record demonstrates that he was unable to be reunified imminently with Child. N.T., 3/4/24, at 105. Specifically, Father's visitation with Child had not progressed beyond therapeutic supervised visitation; his rental home was under construction and not ready for Child; he last tested positive for alcohol in January of 2024; and he remained unemployed or without income to maintain housing.

To the extent that Father asserts CYF "did not make reasonably good faith efforts" because it required him to complete a parenting class but "never

proceeded to make a referral," this claim fails. Father's Brief at 22. This Court has explained that reasonable reunification efforts are not a prerequisite to the termination of parental rights under Section 2511(a)(8). *See In re Adoption of C.J.P.*, 114 A.3d 1046, 1055 (Pa.Super. 2015) (discussing *In re D.C.D.*, 629 Pa. 325, 105 A.3d 662 (2014)). As such, Father's argument is misplaced. We conclude that ample evidence in the record supports terminating his parental rights under the second prong of Section 2511(a)(8).

Turning to the third prong, that termination will best serve Child's needs and welfare, Father argues he has a strong bond with Child, and it "could be detrimental" for Child to sever it. Father's Brief at 22.

PA Child Support Services offered therapeutic supervised visits for nine months, beginning in December of 2022. As best we can discern, Father and Child participated in three virtual visits before his incarceration in January of 2023. *See* N.T., 3/4/24, at 21. According to Ms. Scott, Father's visitation resumed in May of 2023, after his release from incarceration and inpatient drug and alcohol rehabilitation. *Id.* at 13. Thus, Child had a "four-month gap" in not visiting with Father. *Id.* at 27.

During this time, Child participated in individual therapy at PA Child Support Services, and Ms. Scott testified Child's behavioral issues "seemed to stabilize some and was more stable during those periods of involvement in the case than when visitation started back up." *Id.* at 25. In addition, she explained that, during therapy, they would "explore" with Child his relationship

- 18 -

with Father "or relationship with others outside of [the resource family], [and he] didn't conceptualize Father as part of [his] family. The therapist pushed Child to expand upon who else could be in Child's circle. Aside from his resource parents, Child . . . had indicated an employee from Hardee's [restaurant], somebody in that circle." *Id.* at 27. Ms. Scott continued:

> So initially those were the type of conversations with Child of how he conceptualizes his life and his story and making sense of it. For a child of this age, making sense of your world is difficult let alone a world that has been full of trauma.
>
> Sometimes it's hard to know what's up and what's down, so working through that and then trying to figure out where these pieces fit together in terms of his relationship with him and his father. And so that concept was budding and something that is evolved early on in therapy that they worked on.
>
> And, so, when you have this very fragile sort of concept of how those pieces fit together and then it's constantly changing, it becomes quite a tumultuous environment to maintain or sustain any type of healthy relationship or connection there.

*Id.* at 27-28 (cleaned up).

Father's therapeutic supervised visitation resumed in May of 2023, after his release from prison and inpatient drug and alcohol rehabilitation. *Id.* at 13. Ms. Scott explained that Father was "the most stable we had seen him [in May of 2023], and so visits increased[, and were in-person]. But then we started seeing some decline in [F]ather, and then, ultimately, they decreased again." *Id.* Importantly, she testified:

> [I]t seemed there was quite a significant change or decline in [C]hild as [F]ather declined. **So that when you think of the trauma bond.** You know, one person's stability is very co-dependent upon another's. And so that was seen where [Child's]

behaviors escalated, [F]ather struggled at times to manage [C]hild's behaviors in visits and we . . . saw that continual decline[.]

[Child] would decline in visits and engage in a lot of attention seeking, crying, various behaviors, and that seemed to be kind of consistent in their interactions, the fight for power and control from [F]ather[,] and then [C]hild struggling through that.

*Id.* at 25-26 (emphasis added).

As discussed above, Pressley Ridge assumed Father's therapeutic supervised visitation in September of 2023, at which time Father had relapsed and PA Child Support had closed its services. *See* N.T., 2/26/24, at 45. Ms. Hedrick testified Father had two virtual visits with Child between September 25 through November 27, 2023, while he was in the second inpatient drug and alcohol rehabilitation center. *Id.*

Beginning on December 23, 2023, Father started weekly in-person therapeutic supervised visits with Child. *Id.* Ms. Hedrick testified that "the reconnection" between Child and Father "has been tremendous." *Id.* At 53. Ms. Slaymaker, the CYF caseworker, testified that, "over the last couple of months" Child and Father have developed "a healthy bond." N.T., 3/4/24, at 52. Furthermore, Ms. Slaymaker testified Child is equally bonded to his paternal grandmother, who is his pre-adoptive kinship parent. *See* N.T., 3/4/24, at 53. She described all the services that are being provided to Child and confirmed that Child "seems to be making progress in school and with the therapeutic interventions." *Id.* at 62. Ms. Slaymaker attributed "some of that

progress" to the efforts of the paternal grandmother who provides Child the "very structured, regimented" schedule that he needs. *Id.*

The orphans' court concluded the bond is not necessary and beneficial to Child based on "the nature of Father's instability with employment, housing, mental health, and sobriety[, which] has impacted both the quality of visits and Child's bond with Father and impacted Child's needs and welfare." Orphans' Court Opinion ("O.C.O."), 5/2/24, at 24-25. The court determined Child's need for permanency is paramount in this case particularly in light of Child's diagnoses, including but not limited to, the autism spectrum. *Id.* at 25-26. We discern no abuse of discretion. As such, we reject Father's argument that the evidence does not support the court's determination regarding the third prong of Section 2511(a)(8).

The same evidence is relevant to our analysis of Section 2511(b). In addition, Ms. Hedrick testified that Child, who was seven years old, expresses concerns in therapy about Father being homeless, *i.e.*, being "worried about where he was sleeping, where he was staying, if he was being safe, if due to some of the past traumas that [Child] has seen, he was worried about if anybody else . . . was putting [Father] in an unsafe position." N.T., 2/26/24, at 51. Ms. Hedrick testified that, if the court terminated Father's parental rights, she would recommend therapeutic visits "where we include the [paternal grandmother] if she is willing only because if future contact would be allowed" between Father and Child, it would go through her. *Id.* at 54.

Ms. Hedrick testified Child was starting to heal by discussing his trauma with Father, and recently "Father has shown the ability to be that safe person and explain how he wasn't a safe person before and how he is moving forward." *Id.* at 53-54. She testified it would harm Child to end his connection with Father for this reason. *Id.* at 54, 68-69. The orphans' court acknowledged Ms. Hedrick's testimony and stated that "Child will continue to receive therapy." O.C.O. at 24.

On this record, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(b). The testimonial evidence demonstrates Child has a bond with his paternal grandmother equal to that with Father, and she provides the home environment Child needs to progress in his therapeutic treatments. Father does not contend that Child's bond with him is "necessary and beneficial." He claims instead that it would be "detrimental" to Child to sever their relationship. *See* Father's Brief at 24-25.

However, as explained above, the law of this Commonwealth concerning Section 2511(b) holds that a court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *K.T.*, 296 A.3d at 1114. The question before the orphans' court was whether Child would suffer "extreme emotional consequences" by terminating Father's parental rights and, thus, whether the bond was "necessary and beneficial." *See id.* at 1109-1111. Our review of the totality

of the record evidence does not contradict the court's findings in this case that the bond between Child and Father was, in essence, a "trauma bond." **See** O.C.O. at 22-25; **see also** N.T., 3/4/24, at 25; **K.K.R.-S.**, 958 A.2d at 535 (cautioning that "concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.").

We further discern no abuse of discretion by the court in determining that permanency for Child "is critical," and Father was unable to provide it. **See** O.C.O. at 26. Father speculates, at best, when he would be able to provide permanency for Child and satisfy his further special developmental, physical, and emotional needs and welfare. Thus, Father's claim with respect to Section 2511(b) fails. Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>10/29/2024</u>